## SEABROOK v. COMMISSIONER OF INTERNAL REVENUE.

### No. 13677.

United States Court of Appeals
Fifth Circuit.

April 18, 1952.

Rives, J., dissented.

was taken and the Tax Court again sustained the determination of the Commissioner of Internal Revenue of a deficiency in income tax for the fiscal year ended June 30, 1944.[1]

The conflict between the parties rests upon the Commissioner's determination, which was sustained by the Tax Court, that the entire net income of a business conducted under the name of Seabrook Hardware Company was taxable to L. W. Seabrook. Opposed to this determination, the taxpayer contended that the net income should be assessed among the members of a family partnership composed of L. W. Seabrook and his two children, Inez Seabrook Davenport and William Whitmarsh Seabrook.

The facts may be summarized as follows: Petitioner, L. W. Seabrook, has been in the hardware business in Tallahassee, Florida, since 1919. From 1927 until July 1, 1942, he conducted the business as a sole proprietorship under the firm name of Seabrook Hardware Company. By July 1, 1942, the business had grown until it encompassed not only a retail hardware business but included wholesale hardware, building supplies, construction equipment, General Motors trucks, Allis-Chalmers tractors, well drilling, and a repair and machine shop.

The son, William Whitmarsh Seabrook, worked in the business from the time he was a small boy; he worked after school, on week ends, and during vacations; he waited on customers, checked inventories, signed checks, went over accounts receivable, and did whatever was necessary for the good of the business. Thus he became familiar with all facets of the business and showed a real aptitude for it. When William had completed the course of study offered by the local schools at Tallahassee, he entered The Citadel, a military college, located in Charleston, South Carolina. There he majored in civil engineering because both he and his father believed that it would be helpful to him in the hardware business.

Robert Ash, Washington, D. C., Chas. S. Ausley, Tallahassee, Fla., for petitioner.

Robert M. Weston and Ellis N. Slack, Sp. Assts. to Atty. Gen., Theron Lamar Caudle, Asst. Atty. Gen., Charles Oliphant, Chief Counsel, and John M. Morawski, Sp. Atty., Bureau of Internal Revenue, Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

BORAH, Circuit Judge.

This is the second review of this case in this court. When it was here before we withheld decision until the Supreme Court had decided the case of Commissioner v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659, and then we ordered a reversal of the Tax Court's opinion and judgment and remanded the cause to the Tax Court for further proceedings in conformity with the Supreme Court's opinion in the Culbertson case, with the right preserved in either of the parties to offer such additional evidence as would be appropriate. Seabrook v. Commissioner, 5 Cir., 176 F.2d 605. Upon remand, additional testimony

1. The income for fiscal years ended June 30, 1943, and June 30, 1944, is involved but tax was assessed on the income of 1944 pursuant to the Current Tax Payment Act of 1943, c. 120, 57 Stat. 126, 26 U.S.C.A.Int.Rev.Acts, page 385.

Petitioner's daughter, Inez Seabrook Davenport, attended local schools in Tallahassee and graduated from the Florida State College for Women. While she was going to school she worked in the hardware store on week ends and at other times when additional help was needed. For the most part she did office work, which included typing, helping with statements, making up payrolls, making bank deposits, collecting bills, paying bills, signing checks, and advising the persons buying for the homewares department. After completing her work at the Florida State College for Women, in order to obtain more business experience Inez attended the New York University School of Retailing in New York City and as a part of that course she worked in Wanamaker's Department Store each afternoon until December, when she worked full-time. Upon returning to Tallahassee, she commenced working full-time in the hardware business and studying typewriting a few hours each morning at a local vocational school. She ceased to work regularly in the store after April, 1939, and in December, 1940, married James Davenport. Mr. Davenport had a degree in electrical engineering from the Georgia Institute of Technology, as well as practical experience in that field, which made him a desirable prospect for employment in the hardware business. Shortly after they were married Mr. Davenport entered the military service and in February, 1942, he was sent overseas and Inez returned to Tallahassee.

On May 30, 1942, William graduated from college. He had received four years of military training at The Citadel and expected to receive a commission in the army upon graduation. He did not receive his commission, however, until July 13, 1942, despite the fact that most of the students who maintained a certain standing in the R. O. T. C. were commissioned before they finished school. In the meantime, following his marriage on May 30, 1942, he took a four or five day honeymoon trip and returned to Tallahassee to devote his full-time to the hardware business.

From the time the children were old enough to be interested in the business, the father had led them to believe that when they reached their majority and finished their education, he would take them in as partners provided they had learned the business and desired to become a part of it. And through the years he had refused to sell any portion of the business to others, always explaining to those desiring to buy an interest that he intended to bring his children in as partners when they had obtained an education and were old enough. Some six months prior to William's graduation from college, the father, the son, and the daughter discussed when would be the best time to enter into the anticipated partnership, and they agreed that July 1, 1942, the beginning of the new fiscal year, would be most seasonable. One consideration that motivated the father in forming the partnership at that time was the fact that the country was at war. Inez's husband had gone overseas and William, who had received R. O. T. C. training and was physically qualified, expected to be called into the service at any time. The father wanted William and his wife and Inez and her husband to know that they would have something to come back to after the war was over.

In discussions with his son and daughter Mr. Seabrook warned his children of the financial dangers and hard work incident to running a competitive business and told them that if they were not interested in carrying on the business and did not desire to work at it the rest of their lives, he would sell the business and give them their share in money. When informed of their choice, the father asked an attorney to draw up the necessary papers in order to give his son and daughter each a one-fourth interest in the business in consideration of love, affection and $1.00. These instruments recite that the business should be carried on as a partnership under the trade name of Seabrook Hardware Company but a formal partnership agreement was not executed until August 3, 1943, due to the fact that the Seabrooks did not know that a more formal instrument was customary in the formation of a partnership. Following the execution and delivery of the bills of sale, the father filed a gift tax return for

the calendar year 1942, reporting the value of the interest in the company which he had given to the children, and the principal creditors, banks, employees of the company, the Allis-Chalmers Manufacturing Company, the State taxing authorities, and the hardware company's insurance agent were all duly notified of the existence of the partnership.

After the formation of the partnership, Inez and William had their own ideas concerning the operation of the business, which they desired to have carried out, and enthused with their own authority they discussed with their father various problems and policies such as expansion of the wholesale business, separation of the machinery business from the hardware business, the need for better facilities for handling the machinery business, construction of a new plant, personnel problems and shortages of merchandise.

On July 13, 1942, William received his commission in the armed forces and the next day entered on active military duty. Before leaving Tallahassee, William sought and received the assurance of the floor manager of the hardware business that he would remain with the company while William was in the service. Prior to the time when he was sent overseas, William returned to Tallahassee to discuss various business problems with his father and sister. On one occasion the father called William in Massachusetts and requested that he return to Tallahassee to discuss certain machinery contracts, which he did. Also, in the fall of 1942 Mr. Seabrook made a trip to New York to discuss with William the desirability of selling the business. Prior to going overseas in January, 1943, William executed a power of attorney naming his father as his agent and while overseas he continually communicated by correspondence with his father and sister concerning the affairs of the business. He was kept informed as to the operation of the business and at the end of each fiscal year he was furnished copies of the annual statements prepared by the company's auditors.

Inez gave birth to a daughter in October, 1942, and during the period in question she was predominantly busy taking care of the child. However, she went to the store almost every business day to observe how the business was being operated. On such occasions she would confer with the bookkeeper and clerks, see that the merchandise was properly displayed, or look after any other phase of the business. During this entire period Inez and her father constantly discussed various managerial problems and when necessary she helped out with the office work.

When Inez's husband was released from active duty in July, 1945, he did not return to his old job with the Georgia Power Company but began devoting his full time to the Seabrook Hardware Company because of his wife's definite interest in the business. Likewise when William subsequently obtained his release from the military service in November, 1945, he too returned to Tallahassee and resumed his former work. Since their return from active service they have continued to devote their full-time to the business.

The Tax Court, in concluding that the taxpayer, his son, and daughter did not intend to join together in the present conduct of the hardware business either on July 1, 1942, or at any subsequent time during the taxable years in question, reasoned that the personal circumstances of both Inez and William on July 1, were such that neither they nor their father could expect them to contribute services or capital to the business or participate in its management in the near future. The court pointed out that on July 1, William's departure for active duty in the armed forces was imminent and Inez was expecting a child in a few months; that the son and daughter owned no capital originating with themselves which they could have added to the assets of the business; and that the possibility of acquiring funds above and beyond what was needed to meet their own wants was remote. The Tax Court found that the services rendered by William and Inez did not constitute a contribution of vital services during the taxable years; that the discussions and correspondence did not constitute active sharing in the management; that supervision over the business

remained the same as in prior years; and that the son and daughter owned no capital originating with themselves. Accordingly, the court held that the income for the fiscal years in question was earned by the capital, services and management skill of petitioner alone and consequently must be taxed to him.

■ It is clear from the numerous decisions of this court dealing with family partnerships [2] that the acid test for determining their validity for income tax purposes is to be found in the answer to the question: Was the purported partnership arrangement real, honest, and *bona fide,* or was it a mere pretense and a sham? The question in each case is one of fact, to be determined upon the evidence as a whole.

■ It is not essential to the validity of a family partnership that the capital contributed by one of the partners "originate" with himself. It may result from an intra-family gift and where the facts disclose the requisite *bona fide* intent to join together in the present conduct of a business, the members of the family partnership are entitled to have the arrangement recognized for tax, as well as general law, purposes. However, as in the case of a trust where the grantor is trustee and the beneficiaries are members of his family group,[3] due to the relationship involved and the fact that transfers of property to members of the family may be a mere camouflage, an alleged family partnership serves as a warning that the donee may not be the real owner of the property; that there may be only an apparent change of ownership without any disturbance of the donor's dominion and control over the gift or the purposes for which the income therefrom is used. In reaching its decision that the income from the hardware business was earned by the capital, services, and management of petitioner alone, we think the Tax Court,

despite the admonition in the Culbertson case, has continued in its adherence to the view that it is essential to membership in a family partnership for tax purposes that the capital contributed be "original capital" or that the partnership contribute "vital services" or participate in the management and control of the business. While it is true that a court's determination that a partner has not contributed vital services or participated in the management and control of the business or contributed "original capital" may place a heavy burden on the taxpayer to prove the *bona fide* intent of the parties to form a partnership, it by no means follows that such determinations are conclusive. In Commissioner v. Culbertson, 337 U.S. 733, 747, 69 S.Ct. 1210, 93 L.Ed. 1659, the court said, "If the donee of property who then invests it in the family partnership exercises dominion and control over that property—and through that control influences the conduct of the partnership and the disposition of its income—he may well be a true partner. Whether he is free to, and does, enjoy the fruits of the partnership is strongly indicative of the reality of his participation in the enterprise. In the Tower and Lusthaus (Lusthaus v. Com'r, 3 Cir., 149 F.2d 232) cases we distinguished between active participation in the affairs of the business by a donee of a share in the partnership on the one hand, and his passive acquiescence to the will of the donor on the other. This distinction is of obvious importance to a determination of the true intent of the parties. It is meaningless if 'original capital' is an essential test of membership in a family partnership." The court thereupon concluded that the case should be remanded to the Tax Court for a decision as to whether there was a *bona fide* intent that respondent's sons were to be partners in the business, either because of services to be performed or because of contributions of capi-

2. Ginsburg v. Arnold, 5 Cir., 185 F.2d 913; Arnold v. Green, 5 Cir., 186 F.2d 18; Visintainer v. Commissioner, 10 Cir., 187 F.2d 519; Batman v. Commissioner, 5 Cir., 189 F.2d 107; Alexander v. Commissioner, 5 Cir., 190 F.2d 753; Britt's Estate v. Commissioner, 5 Cir., 190 F.2d 946; United States v. Atkins, 5 Cir., 191 F.2d 146; Alexander v. Commissioner, 5 Cir., 194 F.2d 921; Commissioner v. Culbertson, 5 Cir., 194 F.2d 581.

3. Helvering v. Clifford, 309 U.S. 331, 335, 60 S.Ct. 554, 84 L.Ed. 788.

tal "of which they were the true owners" as that term had been defined by the court in the Clifford,[4] Tower,[5] and Horst [6] cases.

Putting to one side the question of whether services rendered by the donees and discussions and advice concerning policies and problems of the business were sufficient to constitute a contribution of vital services or an active sharing in the management, we think the undisputed facts clearly show that there was a *bona fide* intent that the children should be partners in the conduct of the hardware business because of contributions of capital of which they were the true owners as that term has been defined in the cases cited above. Immediately following the execution and delivery of the bills of sale on July 1, 1942, individual capital accounts for the father, his son and daughter were set up on the books of the company to conform to the partnership. Prior to leaving Tallahassee for active duty in the armed services,[7] William left instructions with the company bookkeeper and the other two partners that his wife should be allowed to withdraw funds from his account while he was away and his wife did make withdrawals. Likewise, Inez made substantial withdrawals from her account during the period in question. In the fall of 1942 it was difficult to find personnel and merchandise and Mr. Seabrook felt that the difficulties encountered in running the business under wartime conditions were too much for him. For that reason, he desired to sell the business and discussed the idea with Inez. She informed her father that she was not interested in selling her interest. Mr. Seabrook then made a trip to New York, where William was stationed,

to discuss this subject. William was also opposed to the idea and told his father that he had grown up in the business and felt that he would rather lose it than sell out. He stated that he would prefer to operate with a skeleton force, regardless of what condition the business might be in when he returned from the service, rather than sell his share of the business. Being so minded he asked his father to just stick it out and do the best that he could.

Thus it is obvious from the undisputed facts that all of the parties regarded the son and daughter as the true owners of the property conveyed to them. This was not a mere temporary reallocation of income within the family group;[8] nor did the income continue to be used for the same business and family purposes as before the formation of the partnership.[9] There was a real change in the economic relation of the father and the children with respect to the income.[10] By July 1, 1942, both William and Inez were married and had their own family responsibilities. They were free to and did enjoy the fruits of the partnership. There was no passive acquiescence on the part of the children to the will of the donor.[11] On the contrary, the father believed it necessary to consult the children with regard to the contemplated sale of the business and they evidenced their dominion and control over the property by flatly refusing to go along with the father's desire to sell. Nor is there the slightest suggestion that the Seabrooks were even aware of the tax saving which would result from the arrangement. Indeed, if the creation of the partnership had been a mere tax-saving device, it is strange

4. Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788.

5. Commissioner v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670.

6. Helvering v. Horst, 311 U.S. 112, 61 S. Ct. 144, 85 L.Ed. 75.

7. One who has been a bona fide partner does not lose that status when he is called into military service. Commissioner v. Culbertson, 5 Cir., 168 F.2d 979, 983. Also, the fact that the daughter

gave birth to a baby in October, 1942, does not invalidate the partnership. Singletary v. Commissioner, 5 Cir., 155 F.2d 207.

8. Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788.

9. Commissioner v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670.

10. Commissioner v. Tower, supra.

11. Commissioner v. Culbertson, supra.

that Mr. Seabrook's wife was not also made a partner.

Nor is there reason to doubt that the father's conveyances of property to the children were made and the partnership agreement was entered into with the intent and for the purpose stated by the parties. By July 1, 1942, the date of the formation of the partnership, both William and Inez had completed their education, both were of age, and both were married. It was the beginning of the first new fiscal year following the coincidence of these events. For years the father, his son, and daughter had contemplated that when the chidren reached their majority, had finished their education, and desired to become a part of the business, the father would take them in as partners. That is exactly when the partnership was formed. We think the conclusion is inescapable that the partnership agreement was not a subterfuge but, on the contrary, was *bona fide*; and that on July 1, 1942, the parties acting with a business purpose intended to join together in the present conduct of the business. Any conclusion to the contrary is clearly erroneous.

For the reasons stated the decision and judgment of the Tax Court is reversed with directions to disallow the deficiencies.

RIVES, Circuit Judge (dissenting).

It seems to me that both in Alexander v. Commissioner, 5 Cir., 194 F.2d 921, and in the present case, this court has adopted the test for validity *vel non* of a family partnership recommended by Mr. Justice Frankfurter in his concurring opinion rather than that prescribed by the Court in Commissioner v. Culbertson, 337 U.S. 733, see pages 742, 751, 753, 69 S.Ct. 1210, at pages 1214, 1218, 1219. I concurred specially in the opinion in the Alexander case and would repeat here what I said there. In footnote 6, 337 U.S. on page 739, 69 S.Ct. on page 1213 of its opinion in the Culbertson case the Supreme Court noted that a man hardly becomes a partner in the conventional sense merely because he might

have done so had he not been called into the service. That observation has direct application to a determination of whether William validly became a partner on the eve of his departure for Army service. Inez was subject to a call even more compelling, that of giving birth to and nurturing an infant daughter. Though we may consider the reminder unnecessary, as we said in Culbertson v. Commissioner, 5 Cir., 194 F.2d 581, we should nevertheless remember that the Supreme Court did say in the Culbertson case: "The vagaries of human experience preclude reliance upon even good faith intent as to future conduct as a basis for the present taxation of income." 337 U.S. 740, 69 S.Ct. 1213. During the two year period William worked at the store for only about two weeks, while Inez was preoccupied with the baby and as her father testified:

"A. She worked some; sometimes we got in a tight, she'd come in there and help us, maybe, but her hands were full with other things.

"Q. So that she was busy with the family, rather than working in the business during those two years?

"A. Yes, sir."

In the two fiscal years here involved, I think that the income was earned by the capital, services and skill of the father alone. Drawing income from the partnership is but a small part of the present conduct of the enterprise, and if that feature alone can convert a future intention into a present reality, then the Supreme Court's admonition in Culbertson, supra, will have little practical effect. My brothers are doubtless right in saying, "The father wanted William and his wife and Inez and her husband to know that they would have something to come back to after the war was over." That is the time clearly, it seems to me, when it was intended that William and Inez would join "in the present conduct of the enterprise." I would affirm the decision of the Tax Court and therefore respectfully dissent.