### SCOFIELD v. MAURITZ et al.
### No. 14372.

United States Court of Appeals
Fifth Circuit.
July 10, 1953.

Carlton Fox, and Ellis N. Slack, Sp. Assts. to Atty. Gen., Charles S. Lyon, Acting Asst. Atty. Gen., C. F. Herring, U. S. Atty., Bradford F. Miller, Asst. U. S. Atty., San Antonio, Tex., H. Brian Holland, Asst. Atty. Gen., for appellant.

Homer L. Bruce, Thomas E. Berry and P. R. Rowe, Houston, Tex., Baker, Botts, Andrews & Parish, Houston, Tex., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and RUSSELL and STRUM, Circuit Judges.

HUTCHESON, Chief Judge.

Consolidated for trial and appeal as Civil Action No. 1418, the three suits were for the recovery of income taxes overpaid for the taxable years 1942 to 1945, inclusive, on account of deficiencies assessed against plaintiffs,[1] as the result of the commissioner's action in allocating to the three brothers Mauritz and their wives income which had been allocated to, and returned by, the brothers as trustees of trusts each had created in 1935.

The claim was: that the grantors of these trusts had made valid and *bona fide* gifts to the trusts of the interests in the properties conveyed to them; that the properties were thereafter *bona fide* and in good faith operated by the three brothers and the trusts as joint owners; that where the trusts acquired at their creation interests in partnerships the trusts were valid and *bona fide* members in each partnership; that the trusts owned their corresponding proportion of the net income from said properties and partnerships; and that no part of the income attributed to the trusts should be included in the taxable income of the grantor of the trusts.

The answer, admitting that the deficiency assessments were made and collected as charged, denied that they were illegally collected and, alleging that the defendant was without knowledge or information as to the other matters alleged, the answer demanded proof thereof.

The case thereafter coming on for hearing, there was a lengthy trial, in the course of which plaintiffs offered, the trust instruments, a stipulation and detailed oral evidence as to the Mauritz family, as to their method and manner of doing business, and as to the businesses conducted and transactions had by them over a long period of years. At the conclusion of this testimony and of the very brief testimony of two witnesses offered by defendant, which in no manner controverted plaintiffs' proof, the cause was submitted and fully argued to the court.

The court, making full and detailed findings of fact[2] and conclusions of law, found and concluded: that the incomes claimed by the plaintiffs to belong respectively to

---

1. T. N. Mauritz and S. E. Mauritz, his wife, in the aggregate amount of $42,-823.81, with interest; T. N. Mauritz and Harry Mauritz, independent executors of the estate of Fred Mauritz, deceased, in the aggregate amount of $135,-434.76, with interest; Harry Mauritz in the aggregate amount of $48,244.30, with interest; and Ouida Mauritz in the aggregate amount of $49,688.48 with interest

2. These findings, comprehensive and therefore quite lengthy, may be summarized as follows:

"5. T. N. Mauritz, Fred Mauritz and Harry Mauritz will hereafter be referred to at times as the Mauritz brothers, the five trusts created by T. N. Mauritz and S. E. Mauritz as the T. N. Mauritz trusts, the two trusts created by Fred Mauritz as the Fred Mauritz trusts and the three trusts created by Harry and

five trusts created by T. N. Mauritz and and S. E. Mauritz, two trusts created by Fred Mauritz, and three trusts created by Harry and Ouida Mauritz on December 30, 1935, belonged in law and in fact to those trusts; and that they had been improperly and illegally included by the Commissioner of Internal Revenue in the taxable income respectively of the creators of said trusts.

Ouida Mauritz as the Harry Mauritz trusts."

"6. The parents of the Mauritz brothers were natives of Sweden, being Nils Peter Mauritz born in 1852 and Marie Swenson Mauritz born in 1851. The two oldest children, T. N. Mauritz and Pauline Mauritz, the wife of Courtney F. Combs, were born in Sweden in 1875 and 1877, respectively. In 1879 Nils Mauritz came to America and settled in Iowa and was joined later in the year by his wife and two children and was a farmer in Iowa and Nebraska until in 1892 when he came to Ganado where he bought some land and settled. He then brought his wife and five younger children, consisting of Sallie born in 1879, Fred born in 1882, Harry born in 1884, Nellie born in 1889 and Jennie born in 1891, to Ganado to live. T. N. Mauritz and Pauline Mauritz remained in Nebraska, where they were working, until about 1894, when they came to Ganado, where the father continued to operate as a farmer."

"7. T. N. Mauritz at that time was the only one of the boys who was grown and went into general business activities in and around Ganado, but as his brothers and sisters came on all of them and the father and mother carried on all of their operations jointly with equal interests in everything they did."

"8. About 1907 the parents and all the children except T. N. Mauritz, Fred Mauritz and Pauline Mauritz moved to Hutto, Texas. T. N. Mauritz and Fred Mauritz were then active in business but all of the children and their parents were still carried on in all of their activities on an equal basis. This continued until about 1915 at which time they had accumulated about $100,000. It was then decided that, since the sisters Sallie and Pauline had married and had husbands, there should be a division of the property. Accordingly, a division was made with $30,00 being set aside to the parents, $10,000 to each of the four sisters and $30,000 to the three brothers together. After that the three brothers continued to carry on all of their business operations and activities jointly with each owning a one-third interest therein, and at the same time looked after the affairs of their sisters Jennie and Nellie, who never married, and from time to time helped them with their sup-

port and in the making of investments for them."

"9. On Dec. 30, 1935, T. N. Mauritz was 60 years of age, Fred Mauritz 53 and Harry Mauritz 51. At that time all of their properties and businesses were owned equally by them on the basis of one-third each. They had accumulated a large amount of varied kinds of properties which the parties hereto have agreed cost them $453,486.44. Their properties, however, at that time had a much higher actual value. For the purpose of handling their joint operations they in general carried on all of their affairs and handled their finances through a joint account under the name of Mauritz Brothers. Their properties consisted of several thousand acres of farming and ranch lands, farming operations, cattle raising, the leasing of their lands for oil and gas, and an interest in the following partnerships in which they owned an interest with other parties:
[Enumeration of these omitted as not necessary here]

"10. The families of the Mauritz brothers and their sisters as they existed on Dec. 30, 1935, down to the present time were as follows:
[Here follows a long list which is omitted as not necessary here]

"11. After long consideration the three brothers in Dec., 1935, decided that they would give in trust for the benefit of their children, nieces, nephews and their unmarried sisters an undivided interest in all properties of whatsoever character that they then owned except their personal effects like wearing apparel, furniture, personal automobiles, their life insurance and petty cash, T. N. Mauritz and Harry Mauritz giving a 60 percent interest and Fred Mauritz a 42 percent interest, Fred Mauritz later by supplemental instruments dated Sept. 1, 1941, increasing his gift to a full 60 percent interest. Accordingly, the three brothers on Dec. 30, 1935, executed and delivered trust instruments, all of which have been introduced in evidence in this record:
[This listing not given as unnecessary here]

"12. This finding was that all of said instruments were duly filed when made with the County Clerk of Jackson County.

Based upon these finding and conclusions, the court determined that there had been overpayments as claimed by plaintiffs, and entered judgment for the recovery of the amounts sued for by them.

The collector is here insisting that in so finding and adjudging, the court erred. While the appellees, with equal vigor and apparently greater confidence, relying on the findings of fact and the record on which

"13. By said trust instruments the respective grantors therein conveyed to the trustees therein the percentage interest therein stated of substantially all of their property. The description of the interests conveyed to the trusts is the same in all of the trusts except for the per cent involved and is illustrated by the following description of the property conveyed as set forth in the instrument creating the T. N. & S. E. Mauritz Trust Estate No. One:

" 'An undivided twelve percent of all of the property of every kind and character, real, personal, and mixed, tangible and intangible, belonging to Grantors or either of them, whether alone or as members of partnerships or other firms, associations or undertakings, whatever such property may be situated, and in whatever name or names the same may appear of record or otherwise, including (but not in any sense by way of limitation) all lands, leases, minerals, royalties, improvements, farms, ranches, gins, warehouses, petroleum, petroleum products, stocks of goods, wares and merchandise, businesses, machinery, fixtures, furnishings, equipment, livestock, automobiles, stocks in corporations, stocks in banks, interests in partnerships and other associations, insurance policies, bonds, debentures, governmental obligations, promissory notes, bank deposits, moneys, funds, choses in action, claims and demands of whatsoever nature; saving and excepting only (1) Grantors' personal wearing apparel, personal jewelry, family automobile, and family household furniture and furnishings (including, but not by way of limitation, silver, china, paintings, ornaments and books), (2) any life, health or accident insurance policies insuring the lives or persons of Grantors, and (3) any petty cash in their possession.'

"Each trust thereupon became the owner of the undivided interest in all of said properties so conveyed to it. The trusts were irrevocable."

"14. In 1936 T. N. Mauritz, S. E. Mauritz, Fred Mauritz, Harry Mauritz and Ouida Mauritz duly filed with the Commissioner of Internal Revenue their Federal gift tax returns on account of the gifts made by said trusts of Dec. 30, 1935. Harry Mauritz and Fred Mauritz paid to the Federal Government

their gift taxes thereon, but the gifts of the other grantors resulted in no gift tax liability. In 1942, Fred Mauritz duly filed with the Commissioner of Internal Revenue his gift tax return on account of said gifts made by him by said instruments of Sept. 1, 1941, and paid to the Federal Government gift taxes on account of said gifts."

"19. In the operation of the properties jointly owned by the three brothers and the ten trusts in which no outsiders had interests, the three brothers individually and as trustees exercised general supervision over their operations but the detailed management and running of the various farms, ranches, farming operations and cattle raising were carried on by paid managers."

"20. In the case of partnerships in which other parties were interested, as Mauritz and Carroll, Edna Motor Company and The Mauritz Company, the management and operation of those partnerships businesses was carried on under the day to day supervision and direction of the outside partners like Carroll, Fenner, Wells and Dierschke. In the case of The Mauritz Company, during the time its business was owned entirely by the three brothers and their trusts, its business was operated by hired managers."

"22. All purchases since the creation of the trusts and conveyances of lands, contracts for the sale thereof, oil and gas mineral leases, and division orders have been as to all jointly owned properties executed by the three brothers individually and their trusts in the proportionate interests resulting from the creation of said trusts, and deeds into and out of them in said proportions have been filed for public record with the county clerks of the counties in which the lands involved were located."

"23. The creation of said trusts and their existence and their joint ownership with the three brothers of interests in properties and in the partnerships involved has been at all times a matter of common knowledge among the public at Ganado and in the places where they own properties or interests in partnerships."

"24. Detailed books of account reflecting all the transactions in reference to all of the properties jointly owned by the three brothers and their trusts and all of

they rest, urge upon us, (1) that the question presented to this court is whether the extended findings of fact and conclusions of law of the district court in favor of tax-payers-appellees are, under Sec. 22(a) I.R.C.,[3] clearly erroneous; and (2) that the answer must be in the negative and the judgment affirmed.

Insisting that the primary issue in this case is whether, as determined by the commissioner, each of the three Mauritz Brothers should, in the taxable years 1942 to 1945, inclusive, be charged under Sec. 22(a) of the Internal Revenue Code, with a third of the income of the business carried on by them in those years in the name of Mauritz Bros., or whether such income should be allocated, 40 percent in the aggregate to them and 60 percent in the aggregate to the ten trusts which, on December 30, 1935, they had created for the benefit of their respective children and other relatives, the Collector urges upon us that the commissioner's determination was right and should be approved, the judge's wrong and should be disapproved.

In putting forward its argument in support of this position, appellant brings it to a focus on pages 15 and 16 of his brief by declaring:

"The answer to this question depends upon the answer to each of two underlying or subsidiary considerations, namely, (1) whether the business was, for tax purposes, to be regarded as a partnership consisting of the three brothers and the ten trusts referred to, and (2) whether, regardless of whether there was such a partnership, the income of each of the trusts should, for

federal tax purposes, be regarded as that of T. N. Mauritz and his wife, as the grantors of the five trusts they had created; of Fred Mauritz as the grantor of the two trusts he had created; and of Harry Mauritz and his wife as the grantors of the three trusts they had created.

"Obviously, the first of these underlying questions requires an application to the facts of this case of the principles of the case of Commissioner [of Internal Revenue] v. Culbertson, 337 U.S. 733 [69 S.Ct. 1210, 93 L.Ed. 1659], and related cases hereinafter referred to, and the answer to the second, the application thereto of the principles of the case of Helvering v. Clifford, 309 U.S. 331 [60 S.Ct. 554, 556, 84 L.Ed. 788], and related cases hereinafter referred to. * * *"

The brief then goes on to say:

"Our task here, then, is twofold: First, it is to show that the concern known as Mauritz Brothers was not a partnership during the taxable years, of which the trusts or their beneficiaries were members; and, second, that, whether or not Mauritz Brothers was a partnership and the trusts members thereof, the trusts were what are commonly called 'Clifford case' trusts, with the result that the income of the trusts which each brother and his wife had created was attributable to him and his wife for the taxable year in question.

"And finally, we wish to point out that, while the two subsidiary questions

---

their joint activities have been at all times kept so as to reflect all of said transactions and said books of account have at all times recognized the interests of each of said trusts in all of said transactions in the proportions created by said trust agreements, and all funds and properties have been accounted for by the three brothers and the trustees to the trusts in the proportion of their said ownership as a result of the creation of said trusts."

Other findings not copied here deal in detail with amounts received by the three brothers and the trusts through the

years, with particular dealings in sales of particular property and the filing of their income tax returns and later action by the commissioner with respect thereof.

3. "§ 22. Gross income
   "(a) General definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, or whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, * * *." 26 U.S.C.A. § 22 (a).

140

will be separately discussed under our subpoints A and B, respectively, the evidentiary factors involved in a consideration of the one are the same as those involved in a consideration of the other. The essential difference between the two problems lies, as has already been indicated, in the approach to each; that is to say, in considering the first, i. e., the so-called 'family partnership' issue, we must approach the problem with a view of applying the principles of the Culbertson and kindred cases to the facts, whereas, in considering the second, i. e., the so-called 'Clifford' issue, we must approach the problem with a view to applying the principles of the Clifford and kindred cases thereto."

It thus appears that, instead of approaching the decision of the over all question, whose is the income, on the basis of the underlying and over all facts as found by the district judge in the light of the plain and simple, the controlling, language of the statute, the collector approaches it with a predetermination to give the situation a label and a name which, once affixed to it, will, by a kind of begging of the question, produce the desired, the assumed conclusion.

In Batman's case, Batman v. C. I. R., 5 Cir., 189 F.2d 107, we undertook to carefully point up this tendency of advocates to beg the question by affixing a name or label, and also to point to the dangers and to ways and means of avoiding those dangers.

There it was the taxpayer who applied the label "partnership" to a device for separating the income from the earner, the fruits from the tree, and sought, by the magic of the name applied, to have the label supply the needed proof, that the income which he sought to have ascribed to the son was the son's income and not his, that in

short, the son and not the father, was the owner to the extent of the income ascribed to him, of the tree which produced the fruit.

Here it is the commissioner who, first by invidiously labelling the whole congeries of business activities by which the Mauritz income was earned a spurious family partnership, and second by labelling the trusts "Clifford trusts", seeks to separate the income from its owner, the fruits from the tree.

Unfortunately for the commissioner under the facts proven and under the authorities cited and relied on by him, his effort to label plaintiffs' case away, turns out to be a case of misbranding and mislabelling.

In the first place, nothing in the Culbertson case [4] at all supports the view implicit in the Collector's approach, that Culbertson merely repeats and dogmatically reaffirms the objective tests which the Tower and Lusthaus cases [5] seemed by a kind of judicial legislating to have laid down.

On the contrary, the Supreme Court in the Culbertson case plainly and repeatedly declared that it had not been intended in the earlier cases to prescribe as determinative the objective tests, of which so much was then being made, and that in each case the question for determination was, whether on the facts as a whole the parties concerned had in good faith intended to, and in good faith and in fact, had entered into a *bona fide* partnership.[6]

Unfortunately for the commissioner, too, the facts as proven and as found by the district judge leave in no doubt that whether the relation of the trusts and the brothers be labelled as that of partners in a business or businesses or joint owners of properties and businesses which produced the income, the result is the same. This is that the activities, properties, enterprises and income involved in this case belonged in fact and in law to the individuals and the trusts in

---

4. C. I. R. v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659.

5. C. I. R. v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, 164 A.L.R. 1135; Lusthaus v. Commissioner, 327 U.S. 293, 66 S.Ct. 539, 90 L.Ed. 679.

6. Cf. Tomlinson v. Commissioner, 5 Cir., 199 F.2d 674; Turner v. Commissioner, 5 Cir., 199 F.2d 913; Seabrook v. Commissioner, 5 Cir., 196 F.2d 322; Alexander v. Commissioner, 5 Cir., 194 F.2d 921; Batman v. Commissioner, 5 Cir., 189 F.2d 107; Marcus v. Commissioner 5 Cir., 201 F.2d 850.

the proportions fixed in and by their instruments and dealings, and that the commissioner's attribution of all the income to the brothers was a distortion of the undisputed facts and a misapplication of the law contrary to the truth and right of the case.

When it comes to the collector's second magic label, that the trusts are Clifford trusts, he stands no better. In the first place, while the Clifford case has been called judicial legislation,[7] if it was such, it was of a definite and self limiting kind, in that: (1) on its own facts the case had application to a short term trust; (2) the court laid down the basic issues underlying the determination; and (3) further, it declared [309 U.S. 331, 60 S.Ct. 556], "In this case we cannot conclude as a matter of law that respondent ceased to be the owner of the corpus after the trust was created", and that it could not say "that the triers of fact committed reversible error when they found that the husband was the owner of the corpus for the purposes of § 22(a)."

In the second place, if it can be said that anything is now settled in the wake of the Clifford case and the flood of litigation it has inspired, it is that within judicial limits each case of this kind stands on its own facts and the role of the fact finder, whether it be a member of the Tax Court or a district judge, must be accorded the greatest over all respect, the findings not to be disturbed unless shown to be clearly erroneous.

The author in Montgomery's Federal Taxes, supra, at page 297, dealing not only with the Clifford case itself but with the Treasury Regulations later provided and with the decisions following, declares that

the discouraging aspect of the entire matter is this: " * * * The Supreme Court legislated in the Clifford case. The Treasury legislates differently from the Supreme court in the regulations. And the Congress is the only body having legislative power under the Constitution". He nevertheless, after stating at page 291, "There has been in some cases a tendency to confuse the symptoms with the disease," goes on to say, "The income of a trust is not taxable to the grantor under the Clifford doctrine because the grantor has retained certain powers, but the income of the trust is taxable to the grantor if the retention of those powers, together with all the facts in the case, convinces the trier of the facts that the grantor is in substance and practically (though not legally) the owner of the trust corpus."

What and all that the Supreme Court decided in the Clifford case was that, on the record there before it, the trier of the facts, in that instance the Board of Tax Appeals, having found that regardless of legal title, the grantor was still in substance and practically the owner of the corpus of the trust, the Supreme Court could not as matter of law declare that finding erroneous.

Here the district court painstakingly and carefully setting out the facts which leave in no doubt that the trusts in this case are not Clifford trusts held as a necessary conclusion from those facts that the Mauritz Brothers *did not as grantors continue after they granted the properties to the trusts to be in substance and practically the owners of the corpus which they had conveyed.*

We are convinced that these findings have not been shown to be clearly errone-

---

7. In "The Clifford doctrine", Chapt. VII, Estates, Trusts & Gifts, Montgomery's Federal Taxes 1951 and 1952, at page 289, the author says:

"The Clifford doctrine is judicial legislation. As Mr. Justice Roberts pointed out in a dissenting opinion the Treasury had attempted without success to obtain an amendment to the law taxing the income of short term trusts to the grantor and congress refused to act. (Helvering v. Clifford, 309 U.S. 331 [60 S.Ct. 554, 84 L.Ed. 788].)

"Judicial legislation or not, the Clifford doctrine is now law and will continue to be the law unless and until congress sees fit to do something about it.

"The result of the decision in the Clifford case has been utter confusion * * * (Cf. Schmidt v. Glenn [D.C.], 75 F.Supp. 865; Shapero v. Commissioner, [6 Cir.], 165 F.2d 811; Kohnstamm v. Pedrick [2 Cir.], 153 F.2d [506], 507."

ous. Indeed, we find it difficult upon a reading of the record to see how the conclusion could have been otherwise. The judgment was right. It is affirmed.

RUSSELL, Circuit Judge, concurs in the result.