**RICHARDS et al.**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

**No. 14644.**

United States Court of Appeals Fifth Circuit.

May 26, 1954.

Gibbons Burke, New Orleans, La., for petitioner.

Carolyn R. Just, Sp. Asst. to Atty. Gen., Ellis N. Slack, Asst. Atty. Gen., L. W. Post, Asst. Atty. Gen., H. Brian Holland, Asst. Atty. Gen., Kenneth W. Gemmill, Acting Chief Counsel, Internal Revenue Service, Charles E. Lowery, Sp. Atty., for respondent.

Before HUTCHESON, Chief Judge, and HOLMES and RIVES, Circuit Judges.

RIVES, Circuit Judge.

The single question presented for review is whether [under Section 22(a) of the Internal Revenue Code, 26 U.S. C.A., as interpreted in Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788] the Tax Court correctly held that the taxpayers are accountable for

the dividends on certain shares of stock to which they retained the legal title although an interest in the shares had been donated in trust for their children.

The facts were all stipulated, subject to the right of either party to introduce further evidence. One additional item offered by the petitioner was rejected, but will be referred to later. An accurate and detailed understanding of all of the relevant facts is so necessary to a right decision of the question presented that, at the risk of being tedious, we quote the full substance of the stipulation, and interpolate some footnote comments mostly concerning the documents attached to the stipulation.

"1. In 1933, in proceedings under the Bankruptcy Act [11 U.S.C.A. § 1 et seq.], Saenger Theatres, Inc. and Saenger Realty Corporation, Inc. (hereinafter collectively referred to as 'Saenger') were Debtors in reorganization; E. V. Richards, Jr. (hereinafter referred to as 'Richards') one of the petitioners herein, was appointed by the United States District Court for the Eastern District of Louisiana as Trustee of Saenger.

"2. Paramount Publix Corporation, the owner of all outstanding shares of Saenger, was a debtor in proceedings under the Bankruptcy Act in the United States District Court for the Southern District of New York. It and its Trustees and Paramount Pictures Inc. (its reorganized corporate successor) are hereinafter collectively referred to as 'Paramount.'

"3. In the early part of 1934, the reorganization of Saenger appeared practicable and feasible; and Paramount desired to obtain the assistance of Richards in the financing and operation of reorganized Saenger.[1]

"4. Richards was willing to give such assistance, but only upon the basis of a proprietorship interest in him.

"5. Paramount, after several months of negotiation, acquiesced in Richards' acquiring such proprietorship interest in Saenger.

"6. On November 22, 1934, Richards' and Paramount entered into an agreement (a copy of which is hereto appended as Exhibit A-1, and is hereafter referred to as the Main Agreement) whereby Richards acquired 3,000 shares of Class A stock of Paramount-Richards Theatres, Inc. (hereinafter referred to as 'Paramount-Richards'), being one-half of the shares thereof; and Paramount caused Paramount-Richards to be vested with all the shares of reorganized Saenger.

"7. The capital stock of Paramount-Richards consisted of the aforesaid 3,000 shares of Class A stock acquired by Richards, and 3,000 shares of Class B stock retained at all times by Paramount. Each of said shares of both classes is entitled to one vote at all meetings of shareholders, and the only distinction between the classes is that the Class A shares have the right to elect three directors and the President and Secretary, and the Class B shares have the right to elect three directors and the Vice-President and Treasurer.[2]

1. The Tax Court found that Paramount's purpose in associating itself with Richards was to reap the benefit of his ability and experience.

2. Other terms of said agreement provided various options in favor of Paramount giving it the right to call upon Richards to fix a base price; Richards was required, under penalty, to fix the base price; and then Paramount had the further option, prior to the expiration of a certain period, to require Richards to sell the 3,000 Class A shares to Paramount at 50% of the base price or to require Richards to buy from Paramount the 3,000 Class B shares at 150% of the base price, at Paramount's sole election. It was further provided that at the expiration of that period, Paramount's option would be to require Richards to fix a base price and then Paramount could elect to buy the A shares or to sell the B shares at its sole determination, at 100% of the base price. This option, that Paramount could require Richards to fix a base price and then Paramount could elect to purchase the A shares or require its B shares to be purchased, never would expire.

"8. The reorganization of Saenger was consummated April 29, 1935.

"9. In order to comply with the provisions of an agreement of sale theretofore made by Richards of 750 shares of the stock of Paramount-Richards to M. F. Barr, N. L. Carter, Gaston J. Dureau, H. W. McCoy and H. K. Oliphint, who are hereafter referred to as the 'Individuals' (150 shares to each for the purchase price of $2,336.07 by each) it was necessary for Richards to obtain the consent of Paramount to the transfer.

"10. Paramount prepared, and Richards executed, a letter requesting the consent of Paramount to the transfer to the Individuals;[3] Paramount executed the consent (a copy of which letter and consent is hereto appended as Exhibit B–2); and the transfer was made by an instrument of assignment (a copy of which is hereto appended as Exhibit C–3).

"11. Unless exercised prior to April 29, 1940, these options in favor of Paramount, contained in Exhibit A–1, would expire by limitation. Therefore, by an agreement, dated March 18, 1940, Par-amount and Richards extended all of the provisions of the Main Agreement to be effective until April 29, 1950. A copy of said agreement (which, together with the Main Agreement is hereafter called the 'Extended Agreement') is appended hereto as Exhibit D–4.

"12. In 1941, Paramount and Richards determined that they should engage in the business of erecting and operating open-air drive-in theatres as well as in ordinary motion picture exhibition. Because the drive-in theatre was a comparatively new venture which might have been unsuccessful and because Paramount and Richards desired to limit their losses in such case, they determined to organize Paramount-Richards Enterprises, Inc. (hereinafter referred to as 'Enterprises') to engage upon the venture. Whereupon, an agreement, dated August 28, 1941, was executed by Paramount and Richards for the organization of such corporation and for the distribution of its shares. A copy of said agreement (which, together with the Main Agreement and the Extended Agreement is hereinafter referred to as the 'Richards Agreement') is hereto appended as Exhibit E–5.[4]

---

3. Said request, prepared by Paramount, provided in part, that the rights of Paramount "shall in no wise be affected by any transfer of a beneficial interest in such Class A stock * * * but such rights and obligations shall continue in full force * * *. Neither the Holding Company (meaning Paramount-Richards) nor the Corporation (Paramount) shall be required for any purpose * * * to recognize any of the persons to whom such a beneficial interest shall have been so transferred as the owner of any interest * * *. After such transfer * * * the Corporation (Paramount) may enforce any right conferred on it by the agreement * * *. The reservation of power by the Corporation to enforce its rights shall not be deemed to prevent the person or persons to whom I shall have transferred any beneficial interest in the Class A stock, as aforesaid, from enforcing any rights I may have conferred upon him or them by reason of such transfer of a beneficial interest."

4. That agreement, recited the existence of the earlier agreements, the transfers of a beneficial interest to the Individual Transferees, the deposit of the 3,000 Class A shares of Paramount-Richards in escrow with Austin C. Keough, Vice-President of Paramount, to protect Paramount's rights and options; and provided for the organization of the new corporation with preferred stock to be taken by Paramount-Richards, 250 shares of Class A to be bought by Richards for $25,000 and 250 shares of Class B to be bought by Paramount for the same price.

The agreement further provided that the Class A shares should be held "subject to conditions, restrictions and options in all respects similar * * * to those imposed upon or granted to Paramount * * * with respect to stock held by them in Paramount-Richards"; and that if the option with respect to Paramount-Richards stock were exercised the similar option with respect to Enterprises would be similarly exercised.

It further provided that Richards could transfer to the individual Transferees "beneficial interests in not exceeding 25% of the Class A stock * * * but only subject to conditions and provisions in

"13. Richards requested and Paramount consented to the transfer of 62½ shares of Enterprises to the Individuals, subject to the same terms, conditions, limitations, restrictions and reacquisition options as the transfers to the Individuals of the shares in Paramount-Richards. A copy of the instrument of transfer, the request for, and the consent thereto by Paramount are hereto appended as Exhibit F-6.

"14. In the middle of the year 1941, Richards expressed to his counsel his desire to create several trusts relative to his Class A shares of Paramount-Richards and of Enterprises, for the benefit of his nine children.

"15. Paramount indicated it would agree to such trusts on conditions set forth in correspondence, copies of which are attached hereto as Exhibit G-7, and upon the execution of a request and consent, a copy of which is attached hereto as Exhibit H-8.[5]

"16. On December 29, 1941, Richards sold the beneficial interest in 5% of the Class A shares of Paramount-Richards and of Enterprises registered in his name to Gibbons Burke for $57,500.00, under and pursuant to the request and consent attached hereto as Exhibit H-8, and on January 1, 1943, said Gibbons Burke resold the beneficial interest in said shares to Richards at the same price.

"17. By acts of donation executed on December 26, 1941, by Richards, as head and master of the community Richards donated certain interest relative to 70% of the Class A shares of Paramount-Richards and of Enterprises to John J. Richards, H. K. Oliphint and Gibbons Burke, as Trustees for each of his nine children. John J. Richards is a son of Richards; H. K. Oliphint was Assistant Secretary and a director of Paramount-Richards; and Gibbons Burke is a member of the law firm which is general counsel for Paramount-Rich-

all respects similar * * * to those subject to which the Transferees hold their beneficial interest in the Class A stock of Paramount-Richards as provided in Sections 1 to 5, inclusive, of the Letter * * *."

5. There were submitted to Paramount the forms of papers to be executed. As to the form of request for consent it was stated by Richards' counsel to Paramount that "it follows, except for names, exactly the form of letter heretofore required by Paramount." As to form of the act of donation, and particularly Article 11 protecting Paramount's options, Richards' counsel stated to Paramount: "In our opinion this will be just as binding on the Trustees (for the children) as on the beneficiaries under the existing assignment of beneficial interest" to the Individual Transferees.

Richards' counsel further gave an opinion to Paramount that "while it is true that there will be no beneficial interest whatsoever left in Mr. Richards, nevertheless, in my opinion Paramount's consent to the transfer of this beneficial interest will in no wise prejudice its rights under the agreement of the then trustees of Paramount Publix Corporation or any of the other agreements

with respect to his holding of the Class A shares of the companies."

Richards executed a request for Paramount's consent to the transfer of 70% of the Class A shares to the nine children, in trust. (Request was made for consent to the transfer of a beneficial interest in the remaining 5% of the Class A shares to another individual transferee, but that transaction was not completed.) The request follows precisely the terms of the request for the consent to the transfer of the beneficial interest to the Individual Transferees (Ex. B-1) and particularly provided that:

"The reservation of power by the Corporation (Paramount) to enforce its rights shall not be deemed to prevent the person or persons to whom I shall have transferred any beneficial interest in such stock, as aforesaid, from enforcing against me or my estate, but not against Theatres, Enterprises or the Corporation, and in any event in a separate action against me or my estate to which Theatres, Enterprises and the Corporation will not be parties, any rights I may have conferred upon him or them by reason of such transfer of a beneficial interest."

Said request was consented to by Paramount as of December 1, 1941.

ards and counsel for Richards. A copy of the act of donation in which John J. Richards is the beneficiary is attached hereto as Exhibit I–9, and is in all respects the same as each of the other eight acts of donation, except with respect to the name of the beneficiary. These Trusts are hereinafter referred to as the Burke Trusts.[6]

"18. On March 15, 1942, petitioners filed gift tax returns reporting the transfers referred to in Paragraph 17 hereof, and paid a gift tax in the sum of $117,-552.68 to the Collector of Internal Revenue at New Orleans.

"19. On December 26, 1944, after notices asserting an additional gift tax, petitioners paid an additional gift tax in the sum of $39,847.50, and interest thereon in the sum of $6,646.56, in full settlement of such deficiency.

"20. Upon the death of H. W. McCoy, one of the individuals named in Paragraph 9 hereof, the beneficial interest theretofore owned by him was placed in trust by his widow with Bank of America National Trust and Savings Association, of California, and had been so held.

"21. The community existing between petitioners was dissolved by a judgment of divorce rendered by the Civil District Court for the Parish of Orleans, State of Louisiana, on June 10, 1947. For many years prior to said judgment and prior to 1941 petitioner and his wife had lived separate and apart.

"22. Dividends on all the Class A shares of Paramount-Richards and En-terprises during the years 1942 through 1944, inclusive, were paid to Richards as stockholder of record and deposited in his bank account; and, contemporaneously, Richards issued his personal checks to Individuals in amounts equal to the dividends applicable to 25% of said stock, and to the trustees in amounts equal to the dividends applicable to 70% of said stock.

"23. The only stockholders' meeting of Class A shareholders held during the years 1941–1944, inclusive, was held on March 17, 1941. A copy of the minutes of that meeting is attached hereto as Exhibit J–10.

"24. Richards during said years 1941–1944, both inclusive held the office of President of Paramount-Richards and also was a director. The said Trustees, John J. Richards and Gibbons Burke were not officers or directors of Paramount-Richards during said years.

"25. The trustees of the Burke Trusts have made partial distributions of trust income to the respective beneficiaries and have re-invested the undistributed balance.

"26. In March 15, 1943 the Burke Trusts joined with Richards in purchasing what is now known as the 'Richards Building' located in New Orleans, Louisiana. Richards paid one-fourth of the purchase price and the Burke Trusts the remaining three-fourths. A part of this three-fourths was from cash on hand representing undistributed income of prior years and a part was from the proceeds from the loan from Rochelle Investment Corpo-

---

6. By the nine separate acts of donation, Richards, as head and master of the community, did "irrevocably give, donate, transfer, convey and deliver to Trustees" legal title in and to 233⅓ shares and 19⅕ shares of Class A of Paramount-Richards and of Enterprises, respectively. Since in each of the acts the same number was transferred, a total of 2100 Class A of Paramount-Richards and 175 of Enterprises (70% in each case) were so transferred.

In addition to being irrevocable, the donations were to be held in trust for the maximum allowable period provided by Louisiana law (10 years beyond the death of the settlor); and the acts of donation provided, that in case of disposition of the shares the trustees would receive an interest in the proceeds, unless the shares were disposed of for stock in a corporation in which Paramount would be a stockholder, in which case the trustees would receive a beneficial interest in such stock which would be held "subject to conditions and restrictions as similar as possible to those imposed by the Agreement (Ex. A–1), the Supplemental Agreement (Ex. D–4) * * * and by this letter (H–8)."

ration. This loan was secured by a first mortgage on the Trusts' three-fourths undivided interest.

"27. The Rochelle Investment Corporation is Richards' individual holding company. A small part of the stock of Rochelle Investment Corporation had in 1938 been transferred to nine trusts set up for the benefit of Richards' nine children and are hereinafter referred to as the Clay Trusts.

"28. In 1942, 1943 and 1944 income tax returns were filed by the several Trusts of the Burke Trusts and the income reported was in the aggregate amounts as follows:

| Item | 1942 | 1943 | 1944 |
|---|---|---|---|
| Dividends-United | | | |
| Theatres ........... | $ 11,485.98 | $ 10,053.00) | |
| P–R ............. | 178,499.97 | 210,000.00) | $265,422.00 |
| Interest, Art Investment | | | |
| Corp. | 1,620.00 | 1,620.00 | 1,620.00 |
| Loss, Richards | | | |
| Building ........... | | (13,013.64) | (8,072.22) |
| Total .............. | $191,605.95 | $208,659.36 | $257,349.68 |
| State Income Tax | | 5,159.16 | |
| Legal Fee ............ | | 203.98 | |
| Interest .............. | | 12,618.36 | 24,817.50 |
| Net Income .......... | $191,605.95 | $190,677.86 | $232,532.28 |

"29. The petitioners duly filed Federal income tax returns on the community property basis for the years 1942 to 1944, inclusive, with the Collector of Internal Revenue for the District of Louisiana, at New Orleans, Louisiana.

"30. In the notice of deficiency, the Commissioner has increased the community income on account of the income of the Clay Trusts and the Burke Trusts, explained in Exhibit A attached to the notice of deficiency, as follows:

| | 1942 | 1943 | 1944 |
|---|---|---|---|
| Clay Trusts ........... | $ 67,640.63 | $ 53,296.57 | $ 64,107.73 |
| Burke Trusts .......... | 194,943.16 | 267,019.16 | 301,015.91 |
| Total .............. | $262,583.79 | $320,315.73 | $365,123.64 |

"The Commissioner now concedes that he was in error by increasing the community income on account of the income of the Clay Trusts for the years 1942, 1943 and 1944.

"31. Petitioners concede that the respondent did not err in disallowing the amounts claimed in the years 1943 and 1944 as amortization of landlord's rights under leases assigned to petitioners at the time of the petitioners' acquisition of an undivided interest in an office building."

At the hearing before the Tax Court, petitioners offered to prove that on January 3, 1950, Paramount purchased the 3,000 shares of Class A stock for $3,500,-000. and that the Trustees promptly received their portion thereof ($2,450,-000.00) and the Individual Transferees their portion thereof, but the court refused to take this evidence.

Upon the basis of the foregoing facts, the Tax Court held that the income from the Class A shares of stock of Paramount-Richards and of Enterprises for the years 1942, 1943 and 1944 is includible in the income for the taxpayers for the taxable years. The Tax Court further held that the taxpayers are not taxable on the income received by the trusts from the property which the trustees purchased out of undistributed and accumulated income derived from divi-

dends on the Paramount-Richards and Enterprise stock. The Commissioner acquiesced in the Tax Court's decision and he has taken no appeal. The taxpayers have appealed to this Court.

In brief the Tax Court held that the taxpayers owned the stock in question; that, after the transfers, as before, the taxpayers had legal title to the stock and sufficient of the attributes of ownership to justify taxation under Section 22(a) of the Internal Revenue Code; that, in view of the controls retained and exercised by the head of the community over the corpus of the trusts, they cannot be recognized as separate taxable entities; that, in the circumstances, the transfers in trust amounted in essence to assignments of future income which would not relieve the grantors or shift the impact of the tax from them to the trusts. In sustaining the tax on the dividends here involved, the Tax Court relied on Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788.

In the Clifford case the grantor was held taxable upon trust income paid to his wife as beneficiary where the trust was to continue for a short term of five years or until the prior death of the taxpayer or his wife; and upon termination of the trust the corpus was to go to the grantor or his estate, but any undistributed net income was to be treated as the property of the wife. The grantor was the sole trustee with broad powers of control over the trust property. The reason for the decision was that the grantor retained so many of the attributes of ownership as to justify the conclusion that he continued to be the owner of the trust property within the meaning of Section 22(a). No one element was treated as decisive in determining taxability but the Court looked at the overall picture—the composite of the incidents of ownership and control that the grantor retained. Thus the question whether the grantor remained in substance the owner of the trust property was considered as a question of ultimate fact to be determined in the light of the trust provisions and other evidence. Helvering v. Clifford, supra, 309 U.S. at page 336, 60 S.Ct. at page 557. So considered, the taxpayer has the burden of proof, and the decision of the trier of fact should not be overturned unless clearly wrong. Section 1141(a) of the Internal Revenue Code, as amended by Section 36, Act of June 25, 1948, c. 646, 62 Stat. 869; Scofield v. Mauritz, 5 Cir., 206 F.2d 135. In the present case, however, that rule is tempered somewhat in application because the evidentiary facts upon which the conclusion was based have all been stipulated. Cf. Benton v. Commissioner of Internal Revenue, 5 Cir., 197 F.2d 745, 753.

In our opinion, the decision of the Tax Court was clearly erroneous, and this case does not come within the Clifford rule. We do not have here the case of a short-term trust at all. The transfer was made to the beneficiaries in trust under "the Trust Estates Act, as the same may from time to time be amended, for the maximum allowable period." At the time of the transfer, the Trust Estates Act fixed the maximum allowable period at 10 years beyond the death of the settlor or age 31 of the beneficiary, whichever is the longer. Section 4, Louisiana Act 81 of 1938. Currently, that period has been extended to fix the duration at either 10 years beyond the settlor's death, or "until the death of the beneficiary, whichever is the longer period." Louisiana Act 209 of 1952; LSA-R.S. 9:1794.

The gravamen of the Tax Court's opinion is that record registry of the Class A shares was continued in Richards' name and that he retained the powers to vote the stock and dispose of it. We think that such registry was continued solely for Paramount's protection and at Paramount's insistence. Paramount had an option arrangement with Richards which clearly contemplated the purchase of *all* of the Class A stock from Richards or the sale of *all* the Class B stock to him. Naturally, Paramount did not want to deal with a number of owners of Class A stock who might desig-

nate different option prices which might result in the purchase of shares from some and the sale of shares to others. Hence, its insistence that record ownership remain in Richards and that, as between Paramount and the beneficial owners, Richards' actions would be final and conclusive. There was retained the right in Richards, or in case of his death in his legal representative, to vote the stock "without regard to the wishes or instructions of any of the said persons to whom such a beneficial interest shall have been so transferred", but it was also provided:

> "The reservation of power by the Corporation to enforce its rights shall not be deemed to prevent the person or persons to whom I shall have transferred any beneficial interest in such stocks, as aforesaid, from enforcing against me or my estate, but not against Theatres, Enterprises or the Corporation, and in any event in a separate action against me or my estate, to which Theatres, Enterprises and the Corporation will not be parties, any rights I may have conferred upon him or them by reason of such transfer of a beneficial interest."

That language, we think, effectively prevented Richards from utilizing the record registry for his own advantage and to the detriment of the Individual Transferees and of the trustees. If Richards acted in bad faith, if he acted in his own interests and contrary to the interests of the beneficial owners, it is clear that the beneficial owners could have brought legal proceedings against him. Cf. Cushman v. Commissioner of Internal Revenue, 2 Cir., 153 F.2d 510, 514. It is argued that he could use the voting power to maintain or increase his salary. The donations in trust were executed on December 26, 1941. The provisions of the Main Agreement were then effective until April 29, 1950 limiting Richards' salary as follows:

> "The combined salaries of Richards, as President and General Manager of the Holding Company, Reorganized Saenger, Reorganized Saenger Realty, and of any subsidiaries of any of them, and of one assistant, shall be limited to an aggregate of Six Hundred Dollars ($600) per week * * *."

Assuming that Paramount had not purchased the stock before April 29, 1950, it already owned 50% of the stock, and his salary could not have been changed without Paramount's consent. Any theoretical power of Richards to use the voting power for his own economic benefit was of very little practical importance and would not bring into operation the "bundle of rights" rule of the Clifford case.

In Paramount-Richards Theatres v. Commissioner of Internal Revenue, 5 Cir., 153 F.2d 602, under the same form of transfer, this Court recognized the ownership by the five individuals in one-fourth of the stock. Like considerations lead us to the conclusion here that Richards irrevocably transferred his entire beneficial interest without retaining any substantial economic advantage, but retaining registry solely at Paramount's insistence to protect Paramount's rights. The decision of the Tax Court is therefore

Reversed.